UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
DENNIS URLAUB, SUSAN McKEON STEINMANN,
and PAUL AMES individually and as Officers of the
South Country Peace Group, CHARLOTTE KOONS,
and MICHELLE SANTANTONIO, individually and as
members of the South Country Peace Group, and the
SOUTH COUNTRY PEACE GROUP,

         Plaintiff(s),

    -against-

**OPINION & ORDER**
06CV5227 (SJF) (WDW)

THE INCORPORATED VILLAGE OF BELLPORT,
and FRANK C. TROTTA, PHIL GALLO, ROBERT H.
LYONS, III, JOHN N. ORLANDO and SHERRY
BINNINGTON (being the Mayor and the Trustees
of the Incorporated Village of Bellport), ROGER
TERREL (the Bellport Village Clerk), and
MARILYN REICH (a Clerk in Bellport's Offices),

         Defendant(s).
----------------------------------------------------------X
FEUERSTEIN, J.


I. Introduction

Plaintiffs seek a preliminary injunction ordering defendant The Incorporated Village of Bellport (the Village) to issue a parade permit for August 6, 2007, without requiring an insurance bond or the promise to indemnify the Village for any damages or injury that may result from the parade.


II. Plaintiffs' Motion

 A. Background

-1-

1. Factual Background

For approximately twenty (20) years members of plaintiff South Country Peace Group ("SCPG") and others have held a candlelight "World Peace Vigil" parade on or about each August 6th. Approximately twenty-five (25) participants proceeded south on the public vehicular roadways of Bellport, beginning at a cemetery in the northerly portion of Bellport and ending some nine tenths (9/10th) of a mile later at the Village's Marina, located at the southernmost part of the Village. The purpose of the parade is to protest war and the use of weapons of mass destruction. Until 2006, permits and/or licenses to march were obtained from the Village.

On or about July 21, 2006, plaintiff Dennis Urlaub obtained a parade permit application from defendant Marilyn Reich, a Village employee, which, unlike previous applications, indicated that applicants were to provide the Village with proof of insurance and execute an agreement indemnifying the Village for ". . . any and all claims for damages or injury to persons or property that may be occasioned by, or arise from, the use of such facilities."

Plaintiffs claim in their complaint that they attempted to obtain liability insurance coverage but were unable to do so, and "even were it to be available the premium for its issuance would be so high that they would be unable to afford to pay it." (Compl. ¶ 22).

In early August 2006 plaintiffs advised the Village Board of Trustees (the Board) that they were unable to obtain such coverage and asked for a waiver of the insurance requirement. They did, however, execute the indemnification agreement.

The Board declined to waive the insurance requirement, but suggested that plaintiffs march on the sidewalks adjacent to their originally proposed route, for which a

permit would not be required. Alternatively, the Village suggested that plaintiffs secure a sponsor willing to undertake the insurance obligations. On August 6, 2006, having failed to provide the required insurance or secure a sponsor, plaintiffs proceeded to march on the sidewalks along their originally planned route.

This action was commenced in September 2006 challenging the insurance and indemnification requirements on the Village's parade permit application. On May 16, 2007, plaintiffs filed an application for a permit to march on August 6, 2007. On July 16, 2007, the Board denied the application unless plaintiffs obtained a liability insurance policy and executed the indemnification clause as limited to the amount of liability insurance or secured a sponsor. Alternatively, the Board suggested that the parade proceed along the sidewalks as in 2006. In either event, the Board waived the "resident only" restriction at the Village Marina to accommodate plaintiffs. (See, Minutes of July 16, 2007 Special Village Board Meeting, Defendants' Exhibit F).

2. Procedural Background

The complaint alleges four (4) causes of action. The first cause of action challenges the insurance requirement as an unconstitutional prior restraint on free speech which "gives the Village clerk unbridled and unrestricted powers," (Compl. ¶ 31); the second cause of action challenges the denial of the 2006 application as a denial of plaintiffs' First Amendment right of free speech; and the third cause of action challenges the Village's "acts, policies and procedures" as violative of Section 8 of the New York State Constitution, (Compl. ¶ 35). The fourth cause of action, alleging a violation of the New York States Public Officers' Law, was withdrawn by plaintiffs who

concede that the insurance requirement was neither an amendment to the Village Code nor promulgated in violation of the New York State Public Officers' Law.

The parties met with the Court on several occasions over the ensuing year in an effort to resolve the issues raised by the complaint. On each occasion defendants' counsel detailed the efforts expended by the Village to accommodate plaintiffs: alternate routes for the 2007 parade which would not require a permit; alternative sources for the insurance security; and establishing that a five hundred dollar ($500.00) premium would secure the insurance. Plaintiffs' counsel, on the other hand, made no constructive efforts to secure alternative means by which plaintiffs could achieve their stated goal; stymied all efforts by the Village to settle this matter by refusing to consider alternatives to the route; and insisted on additional concessions from the Village each time a preliminary agreement was reached. For example, plaintiffs' counsel (1) insisted, without substantiation, that his clients were unable to pay any fees and that they were entitled to "nominal" unspecified "compensatory" damages because they had been required to walk on the Village sidewalks instead of in the roadway in 2006; (2) demanded unspecified legal fees which he declined to limit or substantiate in any way despite the early stage of the litigation; (3) refused to permit his clients to sign the very same indemnification clause which they had executed in 2006; and (4) demanded that the Village enter into a consent order changing its permit procedures in accord with a stipulation that had been reached by his co-counsel Alan Polsky in an unrelated and dissimilar case with a large town on Long Island's east end.

On May 29, 2007, the Village advised the Court and plaintiffs that the Village had contacted the local Methodist church which was willing to sponsor plaintiffs' parade,

provide the necessary insurance and execute the indemnification clause of the application. The Court suggested that the parties meet with Reverend Rasmussen, the pastor of the church, to ascertain whether the church would consider future sponsorship as well. Plaintiffs' counsel sent an e-mail to defendants' counsel stating that he would meet with the Reverend and the Village counsel, but adding that additional concessions from the Village would be necessary to settle the matter. (Defendant's Ex. G).

On June 29, 2007, plaintiffs' counsel advised the Court that he had taken it upon himself to advise Reverend Rasmussen "of the dire consequences that could befall his Church," including "loss of all its land and the Church built thereupon," (Reply Affirmation of Stanley M. Gewanter [Gewanter Aff.], p. 6), if the church were found responsible to indemnify the Village for damages in excess of the liability policy which the church had agreed to provide[1]. As a result of this conversation, the church withdrew its offer to sponsor the parade. (Rasmussen Letter of June 29, 2007). Although the Village subsequently agreed to limit the indemnification agreement to the extent of the insurance coverage which the church had agreed to provide, the church board declined to reconsider the withdrawal of its sponsorship. Plaintiffs' application for pendente lite relief followed. Defendant has cross-moved for sanctions pursuant to 28 U.S.C. § 1927.

B. THE LAW

"The principles of First Amendment are not to be treated as a promise that

---

[1] I will not consider at this point the possible ethical implications of counsel's action or the potential impact of his conduct on his continued representation of his named clients.

everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction. It is a nonsequitur to say that First Amendment rights may not be regulated because they hold a preferred position in the hierarchy of the constitutional guarantees of the incidents of freedom. This Court has never so held and indeed has definitely indicated the contrary. It has indicated approval of reasonable nondiscriminatory regulation by governmental authority that preserves peace, order and tranquility without deprivation of the First Amendment guarantees of free speech, press and the exercise of religion."

Poulos v. State of New Hamshire, 345 U.S. 395, 405, 73 S.Ct. 760, 97 L.Ed.2d 1105.

Plaintiffs contend that the insurance and indemnification requirements of the Village application are prior restraints on their First Amendment rights on their face and as applied to them.

> "The essence of prior restraints are that they give public officials the power to deny use of a forum in advance of actual expression. * * * A regulation may constitute a prior restraint even if it is not content-based. * * * Further, prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights. * * *.
>
> The conclusion that a regulation constitutes a prior restraint, however, is not dispositive of its constitutional validity. Although there is a heavy presumption against the validity of a prior restraint, the Court has recognized that government, in order to regulate competing uses of public forums, may impose a permit requirement on those wishing to hold a march, parade, or rally. * * * In particular, content-neutral time, place, and manner restrictions are permitted so long as they are narrowly tailored to serve a significant governmental interest, * * * leave open ample alternatives for communication, and do not delegate overly broad licensing discretion to government officials."

Beal v. Stern, 184 F.3d 117, 124 (2d Cir. 1999) (internal quotation marks and citations omitted).

Plaintiffs seek a preliminary injunction ordering the Village to permit them to march in the Village roadways without proof of insurance coverage or execution of the

-6-

permit application's indemnification provision.

> "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (emphasis in original). Any party seeking a preliminary injunction 'must demonstrate that it will suffer irreparable harm in the absence of the requested relief.' Latino Officers Ass'n v. Safir, 170 F.3d 167, 171 (2d Cir.1999)."
>
> "'[W]hen, as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard.'" Wright v. Giuliani, 230 F.3d 543, 547 (2d Cir.2000) (internal quotation marks omitted); see also Beal v. Stern, 184 F.3d 117,122-23 (2d Cir.1999). That is, plaintiffs 'must establish a clear or substantial likelihood of success on the merits.' Tunick v. Safir, 209 F.3d 67, 70 (2d Cir.2000)."

Sussman v. Crawford, 488 F.3d 136, 139-140 (2d Cir. 2007).

1.  Likelihood of Success on the Merits

> "Just as there are two classifications of statutes for First Amendment free speech purposes, there are two ways to challenge a statute on First Amendment free speech grounds. A 'facial challenge' to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual. An 'as-applied challenge,' on the other hand, requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right."

Field Day, LLC v. County of Suffolk, 463 F.3d 167, 174-175 (2d Cir. 2006) (internal quotation marks and citations omitted).

a.  Facial Unconstitutionality

Plaintiffs contend that the insurance requirement is facially unconstitutional

because it gives the Village Clerk unbridled discretion to reject an application.

> "At the heart of our First Amendment jurisprudence lies the concern that if the government were able to impose content-based burdens on speech, it could effectively drive certain ideas or viewpoints from the marketplace. * * *. As a safeguard against government censorship, we consider regulations of speech based on its content to be presumptively invalid, * * *, upholding such regulations only if they withstand strict scrutiny. On the other hand, we apply 'intermediate scrutiny' to regulations of expressive activity that are not based on content. Content-neutral regulations may limit the time, place, or manner of expression-whether oral, written, or symbolized by conduct-even in a public forum, so long as the restrictions are reasonable, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information. * * *
> 
> In this 'intermediate scrutiny' context, by narrowly tailored to serve a significant governmental interest, * * *, we do not mean to imply that a regulation must be the least restrictive or least intrusive means of achieving the stated governmental interest, * * *. Rather, the narrow tailoring requirement is satisfied so long as the * * * content-neutral regulation promotes a substantial governmental interest that *would be achieved less effectively absent the regulation*. (emphasis in the original). * * *. A content-neutral 'time, place or manner' restriction will be considered narrowly tailored unless a substantial portion of the burden on speech does not serve to advance its goals. * * *.
> 
> Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech. * * *. Provided that a regulation serves purposes unrelated to the content of expression, it will be deemed content-neutral, even if it has an incidental effect on some speakers or messages but not others. * * *. Regulations that target only the potentially harmful secondary effects of speech are therefore content-neutral and trigger intermediate, rather than strict, scrutiny. * * *."

Mastrovincenzo v. City of New York, 435 F.3d 78, 97-98 (2d Cir.2006) (internal quotations, citations and footnote omitted).

A requirement of liability insurance is not per se unconstitutional because "the state has a legitimate interest in protecting itself from liability for injuries associated with the use of its property." Eastern Connecticut Citizens Action Group v. Powers, 723

F.2d 1050, 1056 (2d Cir. 1983). See also Rock Against Racism v. Ward, 636 F.supp 178, 180 (S.D.N.Y. 1986).

The part of the application to which plaintiffs object states in relevant part:

> "Guidelines for submission of application are as follows:
>
> 1. Review the enclosed _____ (sic) Municipality Policy on Use of Village Facilities.
>
> 2. Review the Insurance Requirements for using Municipal Facilities, and forward to your insurance carrier for issuance of required certificates. NOTE: The Municipal Board reserves the right to require alternative liability limits when applicable.
>
> \* \* \*
>
> The undersigned, an officer of the Organization requesting use of the Municipalities [sic] facilities, or the individual requesting use of the Municipalities [sic] facilities, guarantees observance of all regulations governing use of facilities of the Municipality, payment of any charges incurred and states that the organization agrees to indemnify and save harmless the Municipality and the Municipal Board against any and all claims for damages or injury to persons or property that *may be occasioned by, or arise from, the use of such facilities.* (emphasis supplied).
>
> \* \* \*
>
> No one will be allowed to use municipal facilities with out [sic] the Application, a copy of the Insurance Certificate, and the fee returned to the Municipality.
>
> Insurance Requirements for Use of Facilities
>
> Organization:
>
> An organization using the facilities must comply with Municipality Use of Facility Standards. It is suggested that the organization maintain at a minimum the following, giving evidence of same to the Municipality in the form of a Certificate of Insurance, copy of the General Liability Declarations Page and copy of the Additional Insured Endorsement and provide 30 days notice of cancellation,

non-renewal or material change. New York State licensed carrier is preferred; any non-licensed carriers will be accepted at the Municipalities [sic] discretion. The insurance carrier must have an AM Best Rating of at least A-IX. Workers Compensation and NYS Disability is required for any organization that have [sic] employees that will be working on the premises . . ." (emphasis added).

\* \* \*

II.    UMBRELLA LIABILITY - Recommended

| | |
|---|---|
| Coverage | Umbrella Form or Excess following form of primary General Liability and Automobile Liability |
| Suggested Limit | $2,000,000 |
| Additional Insured | Municipality and all appointed and elected officials, employees and volunteers |

III.    WORKERS COMPENSATION AND NYS DISABILITY

Statutory coverage is required if the Organization has employees that will be working on the premises.

Individual/Resident:

The Individual shall provide a copy of their Homeowners or Apartment/renter's Policy Declarations Page - minimum liability limit of $100,000. Policy shall not exclude the off-premises activities of the insured.

\*The Municipal Board reserves the right to require alternative liability limits when applicable."

Plaintiffs have failed to demonstrate the clear likelihood of success on the merits of their facial challenge to the insurance and indemnification provisions of the Village's permit application.

First, as plaintiffs have now conceded, the "Insurance Requirements for Use of

-10-

Facilities" section of the application was not promulgated by the Village, but was placed in the application at the behest of the Village Insurer, which has advised the Village that if it does not secure "risk transfer" coverage, the Village will be liable for additional premiums which it would be required to pass on to its residents in the form of additional property assessments. (Affidavit of Nicholas Salerno in Opposition to Motion for Preliminary Injunction dated July 19, 2007 [Salerno Aff.]). In addition, the Village would face the possible loss of the present and most cost-effective insurance plan for the Village. (Id.).

Moreover, and contrary to plaintiffs' claim, the Village Clerk does not grant or deny permit applications; rather they are submitted to the Village Board and determined by the Board of Trustees, which is bound by its Code to make permit determinations based only upon considerations of traffic circulation and public safety. (Bellport Village Code § 17-121(c)).

The insurance and indemnification provisions are relevant to the legitimate government concerns regarding traffic circulation and public safety, and without reference to the purpose of any proposed event. Moreover, content-neutral concerns for the public fisc are, as well, appropriate governmental considerations. See Santa Monica Food Not Bombs v. City of Santa Monica, 450 F.3d 1022, 1056 (9th Cir. 2006).

Second, it should be noted that the insurance requirements listed in the application are, in fact, precatory. The only mandatory requirement is that the organization comply with the Village's "Use of Facility Standards." To this requirement, plaintiffs apparently have no objection. The following section of the application, to which plaintiffs do object, only makes suggestions as to what amount is recommended

for Commercial General Liability, Umbrella Liability and Workers' Compensation and Disability insurance and appears to be directed to commercial organizations which seek permission to stage commercial events.

The following section of the application, which refers to Individual/Resident applicants and which also could arguably include plaintiffs, requires only the presentation of the Declarations Page of a homeowner/renter insurance policy in the amount of one hundred thousand dollars ($100,000.00) which does not exclude off-premises activities of an insured. Neither party addresses this clause which is a specific, narrowly tailored requirement, content-neutral and does not provide for the exercise of any discretion by any official based upon an events purpose or message. To the extent that the provision below this section, marked with an asterisk, states: "*The Municipal Board reserves the right to require alternative liability limits when applicable," it is unclear whether this applies to the individual/resident applicant or the commercial organization. However, assuming, without deciding, that it applies to both, the only argument that could be raised in opposition would be that it might permit waiver for favored groups or individuals.[2] In any event, as stated in Thomas v. Chicago Park District, 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002):

> "That is certainly not the intent of the ordinance, which * * * has [been] reasonably interpreted to permit overlooking only those inadequacies that, under the circumstances, do no harm to the policies furthered by the application requirements. * * *. Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional, but we think that this abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements . . . On

---

[2] Plaintiffs have not only failed to raise this argument, but have actively sought a waiver in their own favor.

balance, * * * the permissive nature of the ordinance furthers, rather than constricts, free speech."

Id. at 325, 122 S.Ct. 775.[3]

Plaintiffs also object to the application's indemnification clause which is clearly content-neutral and is required of all applicants. Without commenting upon plaintiffs' counsel's creativity[4], suffice it to say that similar content-neutral and narrowly tailored indemnification provisions which seek to protect the general populace from liability for injuries or damages occurring at events orchestrated and executed by particular groups or individuals have been routinely upheld, providing that an applicant's proven indigency is a consideration in the provision's application. See, e.g. Thomas, 227 F.3d 921 (7th Cir. 2000), aff'd, 534 U.S. 316, 122 S.Ct. 775; Santa Monica Food Not Bombs, 450 F.3d at 1056; Van Arnam v. General Services Administration, 332 F.Supp.2d 376 (D.Mass. 2004).

Thus, plaintiffs have failed to demonstrate that the insurance and/or indemnification provisions of the Village application "delegate overly broad licensing discretion to a government official," Forsyth County, Ga. v Nationalist Movement, 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992), or are otherwise content specific. Since these narrowly tailored requirements are content-neutral, in furtherance

---

[3] The Village nonetheless, exercised that very discretion in plaintiff's favor offering, in lieu of the proof of insurance, the payment of five hundred dollars ($500.00).

[4] Although the Third Circuit, in Nationalist Movement v. City of York, 481 F.3d 178 (3d Cir. 2007) upholds an indemnification clause almost identical to the one contained in the Village of Bellport application, counsel "quotes" a statement by the court which criticizes a reimbursement provision and substitutes the word "indemnification" for "reimbursement." (See Gewanter affidavit, ¶ 3.)

-13-

of legitimate governmental goals, and do not provide for discretionary application based upon an event's purpose or message, and since the Village's implementation demonstrates its efforts to provide ample alternative means for communication, plaintiffs have failed to demonstrate a likelihood of success on the merits of their challenge to the facial constitutionality of the insurance and indemnification provisions.

### b. Applied Unconstitutionality

Plaintiffs contend that the Village permit application provisions requiring insurance and indemnification are unconstitutional as applied to them because SCPG does not maintain an insurance policy and is financially unable to comply with the application provisions.

The Village has provided plaintiffs with an insurance broker who can secure the necessary coverage for a five hundred dollar ($500.00) premium. (See Affidavit of Nicholas Salerno in Opposition to Motion for Preliminary Injunction [Salerno Aff.]; Declaration of Steven C. Stern in Opposition to Motion for Preliminary Injunction [Stern Decl.] ¶ 7). Although plaintiffs contend that they are financially unable to meet even this reduced premium requirement, the evidence is to the contrary.

The affidavit of Paul Ames, treasurer of SCPG, and in camera inspection of the recent bank records of SCPG, indicate the availability of funds to cover the insurance premium as well as a documented ability to raise funds for different projects and purposes. Nevertheless, Mr. Ames contends ". . . we have yet to pay all of our organizational dues, which we pay as they are presented and approved by the Board. Also, we are now preparing for a mailing related to our World Peace Vigil event . . . and

will need to conduct at least one more mailing this year for our annual meeting and <u>fund raiser. Other fund-raising events are also possible</u>. . . . Even if we could afford to pay for insurance this year (estimated at $750 - $1500 by [unspecified] industry standards) doing so would severely restrict our ability to continue our abilitiy (sic) to continue our educational mission. . . ." (Ames Affidavit) (emphasis added).

Aside from the failure of Mr. Ames to support his claims with specific details (other than the demonstrated ability of SCPG to raise funds in excess of eleven thousand dollars ($11,000.00)), his affidavit undoubtedly expresses the plight of every nonprofit organization: insufficient resources to fund every organizational desire or goal. However, neither the affidavit of Mr. Ames or any other evidence proffered by plaintiffs substantiates their claim of indigency which might warrant a waiver of the application's financial security requirements. See e.g. Van Arnam, 332 F.Supp.2d at 376. Nor does Mr. Ames address the unrefuted claim by defendants that the insurance requirement can be satisfied by a five hundred dollar ($500.00) premium payment.

In addition, neither Mr. Ames nor any other plaintiff has explained why they are unwilling or unable to proffer a homeowner/renter policy or to execute the indemnification provision which was executed previously by SCPG or pay the $500.00 premium and execute the hold harmless clause which the Village has agreed to limit to the insurance coverage which can be purchased for the reduced premium payment. (See Minutes of Special Village Board Meeting, July 16, 2007, defendant's Ex. F). Since plaintiffs have not shown that the insurance and indemnification provision of the application are unconstitutional as applied to them, they have failed to demonstrate the clear likelihood that they will succeed upon the merits of this claim.

2. <u>Irreparable Injury</u>

Courts have held, without elaboration, that the mere allegation of denial of a First Amendment right is sufficient to satisfy the requirement of irreparable injury on an application for a preliminary injunction insofar as it is a facial challenge to constitutionality. See <u>Tunick</u>, 209 F.3d at 70; <u>Santa Monica Food Not Bombs</u>, 450 F.3d 1022. However, as the Second Circuit noted in <u>Beal</u>, 184 F.3d 117, the conclusion that freedom of expression is actually threatened involves an examination of the merits of a particular case.

An examination of plaintiffs' claim of unconstitutionality of the insurance and indemnification provisions of the Village permit application as applied indicates that they have failed to meet this prong of their application for a preliminary injunction as well.

The only requirements that plaintiffs must fulfill in order to receive the permit to parade in the vehicular roadway is the payment of the five hundred dollar ($500.00) premium for insurance and the execution of the indemnification clause which the Village has limited in application to the amount of insurance which plaintiffs are required to purchase. Thus, the only injury which plaintiffs can arguably suffer is the five hundred dollar ($500.00) expenditure, which can be reimbursed to them by the Village if the plaintiffs do in fact ultimately succeed on their claim.

On the other hand, and even though it need not be considered here, it is noted that the equities favor the Village, which could suffer the severe and possibly irrevocable and irreparable injury of loss of its present and most cost-effective insurance coverage, for which plaintiffs, should the Village ultimately prevail, could offer no solution.

-16-

Plaintiffs also claim that the offer by the Village to repeat last year's parade route on the Village sidewalks (without requiring a permit) will "seriously diminish" the "exposure and impact of our protest/march parade" and place plaintiffs "in a position of personal peril." (See Ames Affidavit dated July 2, 2007). Aside from the obvious unlikelihood that it is riskier to walk on a sidewalk than in a vehicular roadway, the videographed evidence of the sidewalk parade route which plaintiffs followed in 2006 does not support plaintiffs' claim of dangerousness. (See Defendants' Ex. D). Moreover, the 2006 application which was completed by plaintiffs indicates a recognition of the liability concerns for which the Village requires coverage.[5] Further recognition of the dangerousness of the proposed roadway route vis-a-vis the sidewalk is evidenced by plaintiffs' counsel's threat of excess liability responsibility which caused the Church to withdraw its previously proffered sponsorship.

Finally, plaintiffs have failed to demonstrate how their message would be diminished or diluted by being required to walk on the sidewalk or how it would otherwise constitute irreparable injury. See, e.g. Bronx Household of Faith v. Board of Education of City of New York, 331 F.3d 342, 350 (2d Cir. 2003) (holding that in instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must articulate a specific present objective harm or a threat of specific future harm). "The theoretical possibility of a chilling effect" on

---

[5] In a letter by Paul Ames dated July 16, 2006, he states, in pertinent part: "We are requesting police/code enforcement escort <u>to minimize traffic confusion and safety hazards</u>. * * * Your participation would be most welcome as escort from the Police or Village helps immensely <u>to minimize dangerous encounters with impatient motorists</u>. Suffolk Police and/or Bellport Village Code Enforcement presence will facilitate our use of the southbound land of the street (Station Road crossing Main Street to Bellport Lane) in a safe and efficient manner." (Defendants' Ex. C) (emphasis added).

plaintiffs' speech in this case is "too conjectural and insufficient to establish irreparable harm." Id. (citing Latino Officers Ass'n v. Safir, 170 F.3d 167, 171 (2d Cir. 1999).

Based upon the foregoing, plaintiffs have failed to demonstrate that they would suffer irreparable injury based upon a denial of their application for a preliminary injunction.

III. Defendants' Cross Motion

Defendants cross motion for sanctions pursuant to 28 U.S.C. § 1927 will be held in abeyance pending the ultimate determination of this action.

IV. Conclusion

For the reasons set forth herein, plaintiffs' motion for a preliminary injunction is denied and defendants' cross motion for sanctions is held in abeyance pending the ultimate determination of this action.

SO ORDERED.

Sandra J. Feuerstein
United States District Judge

Dated: July 27, 2007
Central Islip, New York

Copies:

Alan Polsky, Esq.
630 Johnson Avenue, Suite 006
P.O. Box 170
Bohemia, New York 11716

Stanley Martin Gewanter, Esq.
New York Civil Liberties Foundation
9 Stiles Drive
Melville, New York 11747

Miranda Sokoloff Sambursky Slone
Verveniotis LLP
240 Mineola Blvd.
Mineola, New York 11501
Attn:   Steven C. Stern, Esq.